FILED

2020 May-22  PM 01:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **DOROTHY WOODS,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 7:18-cv-01487-MHH** |
| | } | |
| **ANDREW SAUL,** | } | |
| **Commissioner of the** | } | |
| **Social Security Administration,**[1] | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), plaintiff Dorothy Woods seeks judicial review of a final adverse decision of the Commissioner of Social Security. The Commissioner denied Ms. Woods's claims for disability insurance benefits and supplemental security income. For the reasons stated below, the Court remands the Commissioner's decision because substantial evidence does not support the ALJ's RFC determination.

---

[1] The Court asks the Clerk to please substitute Andrew Saul for Nancy A. Berryhill as the defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 25(d) (When a public officer ceases holding office, that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

## I.    PROCEDURAL HISTORY

Ms. Woods applied for disability insurance benefits and supplemental security income.  (Doc. 7-4, pp. 2, 16).  She alleges that her disability began on September 18, 2015.  (Doc. 7-4, pp. 2, 16).  The Commissioner initially denied Ms. Woods's claims.  (Doc. 7-4, pp. 2, 16).  Ms. Woods requested a hearing before an Administrative Law Judge (ALJ).  (Doc. 7-5, p. 14).  The ALJ issued an unfavorable decision.  (Doc. 7-3, pp. 11-21).  The Appeals Council declined Ms. Woods's request for review, making the Commissioner's decision final for this Court's judicial review.  (Doc. 7-3, p. 2).  *See* 42 U.S.C. §§ 405(g) and 1383(c).

## II.    STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and his 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In evaluating the administrative record, a district court may not "decide

the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If a district court finds an error in the ALJ's application of the law, or if the court finds that the ALJ did not provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III.   SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

3

*Winschel*, 631 F.3d at 1178.

The ALJ determined that Ms. Woods met the Social Security Act's insured status requirements through December 31, 2019, and that she had not engaged in substantial gainful activity since the alleged onset date of September 18, 2015. (Doc. 7-3, pp. 12, 14). The ALJ determined that Ms. Woods suffered from the following severe impairments: hypertension, diastolic dysfunction, cervical and lumbar spine degenerative disc disease, knee degenerative joint disease, obesity, chronic obstructive pulmonary disease (COPD), and left shoulder degenerative arthritis. (Doc. 7-3, p. 14). The ALJ found that Ms. Woods had no non-severe impairments. (Doc. 7-3, p. 14). Based on a review of the medical evidence, the ALJ concluded that Ms. Woods did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 7-3, p. 14).

Given her impairments, the ALJ evaluated Ms. Woods's residual functional capacity. The ALJ determined that Ms. Woods could perform a full range of light work. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). "Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20

4

C.F.R. §§ 404.1567(b), 416.967(b).  "To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities."  20 C.F.R. §§ 404.1567(b), 416.967(b).

Based on this RFC, the ALJ concluded that Ms. Woods could not perform her past relevant work which were medium work positions.  (Doc. 7-3, p. 19).  Relying on the Medical-Vocational Guidelines and considering Ms. Woods's age, education, and work experience, the ALJ determined that Ms. Woods was not under a disability within the meaning of the Social Security Act.  (Doc. 7-3, p. 20).  Accordingly, the ALJ denied Ms. Woods's claims.  (Doc. 7-3, pp. 20-21)

## IV.   ANALYSIS

Ms. Woods contends that she is entitled to relief from the ALJ's decision because the ALJ failed "to fully and fairly develop the record, resulting in a deficient RFC."  (Doc. 9, p. 1, ¶ 1).  The Court begins its analysis with a review of Ms. Woods's medical records and then considers whether substantial evidence supports the ALJ's RFC finding.

### A.   Ms. Woods's Medical Records

Though the Court focuses its review of Ms. Woods's medical records on records dated after her alleged onset date in September 2015, Ms. Woods's medical history prior to her alleged onset date is relevant to the analysis in this case.  In May 2013, Ms. Woods complained of chest pain and sought emergency treatment at DCH

Regional Medical Center.  (Doc. 7-10, pp. 6, 12).  During DCH's triage assessment, Ms. Woods told a registered nurse that she (Ms. Woods) took Accupril (40 mg tablet twice daily) for hypertension.   (Doc. 7-10, pp. 6, 15).[2]   Ms. Woods's other medication included Flexeril (10 mg tablet three times daily), Norvasc (10 mg tablet once daily), Hydrodiuril (25 mg tablet once daily), and naproxen (500 mg tablet twice daily).[3]

Ms. Woods reported experiencing right-side chest pain that radiated to her upper back and neck, shortness of breath, and dizziness.  (Doc. 7-10, pp. 6, 16).  Ms. Woods described a gradual onset of sharp and intermittent pain.  (Doc. 7-10, pp. 6, 16).  Ms. Woods rated her pain as eight out of ten.  (Doc. 7-10, p. 6).  Ms. Woods stated she had experienced chest pain before and had a normal stress test two years earlier.  (Doc. 7-10, p. 16).  The RN noted that Ms. Woods's skin was warm and dry,

---

[2]   "Accupril is used to treat high blood pressure (hypertension)." https://www.drugs.com/accupril.html (last visited Mar. 31, 2020).

[3] "Flexeril (cyclobenzaprine) is a muscle relaxant. . . . used together with rest and physical therapy to treat skeletal muscle conditions such as pain, injury, or spasms." https://www.drugs.com/flexeril.html (last visited Mar. 30, 2020).

"Norvasc (amlodipine) is a calcium channel blocker that dilates (widens) blood vessels and improves blood flow. . . . used to treat chest pain (angina) and . . . . high blood pressure (hypertension)."  https://www.drugs.com/norvasc.html (last visited Mar. 30, 2020).

Hydrodiuril is a diuretic "used to treat high blood pressure." https://www.webmd.com/drugs/2/drug-7144/hydrodiuril-oral/details (last visited Apr. 1, 2020).

Naproxen is a nonsteroidal anti-inflammatory drug (NSAID) "used to treat pain or inflammation caused by conditions such as arthritis."  https://www.drugs.com/answers/what-are-naproxen-500-mg-use-for-345145.html (last visited Apr. 1, 2020).

her breathing was not labored, her pulse was 61, her blood pressure was 219/114, her oxygen saturation percentage was 98, and her weight was 219 pounds.  (Doc. 7-10, p. 6).

After she received oxygen therapy and intravenous medication, including maximum strength Mylanta (240 mg), Ms. Woods's blood pressure improved to 164/105, her pulse to 58, and her oxygen saturation percentage to 100.  (Doc. 7-10, pp. 11, 13- 15).  An RN noted that Ms. Woods was "awake and alert," showed no signs of acute distress, and talked "with ease."  (Doc. 7-10, p. 13).  Ms. Woods rated her pain as a seven.  (Doc. 7-10, p. 11).

Dr. Jones, an emergency room physician, examined Ms. Woods and detected right-sided chest tenderness.  (Doc. 7-10, p. 19).  Dr. Jones reported that Ms. Woods's heart rate and rhythm and respiratory functioning were normal.  (Doc. 7-10, p. 19).  Dr. Jones reviewed Ms. Woods's chest x-ray results in which Dr. Guarisco, a radiologist, reported "[s]table chest findings" and "[n]o interval change from prior study."  (Doc. 7-10, pp. 20, 39).  Dr. Jones found that Ms. Woods's lab results were unremarkable.  (Doc. 7-10, p. 22).  Dr. Jones diagnosed Ms. Woods with chest pain, shortness of breath, and hypertension and recommended that she "continue care in the hospital."  (Doc. 7-10, pp. 18, 22, 23).  Ms. Woods agreed to that plan.  (Doc. 7-10, pp. 11, 22).

Based on a hospital referral, Dr. King, a radiologist, conducted a lower extremity venous evaluation of Ms. Woods and found no evidence of thrombosis. (Doc. 7-10, p. 38).[4]   Dr. Pandey, a DCH cardiologist, administered a stress echocardiogram on Ms. Woods.  (Doc. 7-10, pp. 2, 35, 41).[5]  Dr. Pandey noted that Ms. Woods exercised nine minutes and stopped because of fatigue.  (Doc. 7-10, p. 2).  During the procedure, Ms. Woods's heart rate increased from 51 to 147, and her blood pressure increased from 127/81 to 166/86.  (Doc. 7-10, pp. 2, 35).  Ms. Woods's baseline EKG showed "minor nonspecific inferior and lateral T wave inversion."  (Doc. 7-10, pp. 2-4).[6]  Dr. Pandey found that Ms. Woods was negative for chest pain, ST change, arrhythmia, wall motion abnormality, and ischemia. (Doc. 7-10, p. 2).[7]

---

[4] "Deep vein thrombosis (DVT) occurs when a blood clot (thrombus) forms in one or more of the deep veins in [the] body, usually in [the] legs."   https://www.mayoclinic.org/diseases-conditions/deep-vein-thrombosis/symptoms-causes/syc-20352557 (last visited Apr. 20, 2020).

[5] "An echocardiogram uses sound waves to produce images of [the] heart. . . . to identify heart disease."      https://www.mayoclinic.org/tests-procedures/echocardiogram/about/pac-20393856 (last visited April 20, 2020).

[6] An EKG or ECG stands for electrocardiogram, a procedure that records "the electrical activity of the heart." https://www.medicinenet.com/script/main/art.asp?articlekey=3212 (last visited Apr. 20, 2020).

[7] "The ST segment refers to the flat section of an electrocardiogram (ECG) reading and represents the interval between jagged heartbeats. When a person has a heart attack, this segment will no longer be flat but will appear abnormally elevated."   https://www.verywellhealth.com/stemi-st-segment-elevation-myocardial-infarction-1746032 (last visited Mar. 31, 2020).

"The term 'arrhythmia' refers to any change from the normal sequence of electrical impulses. . . . [that] caus[e] the heart to beat too fast, too slowly, or erratically." https://www.heart.org/en/health-topics/arrhythmia (last visited Mar. 31, 2020).

Because Ms. Woods's stress test did not reflect ischemia and her condition had improved, DCH discharged her from the hospital.  (Doc. 7-10, p. 42).  The discharging doctor instructed Ms. Woods to follow her medication regimen, visit her primary care physician, and resume usual activities.  (Doc. 7-10, p. 42).  Ms. Woods's discharge medication list included a new prescription for Lipitor (one 40 mg tablet nightly).  (Doc. 7-10, p. 45).[8]

In July 2014, Ms. Woods visited DCH's emergency department and complained of chest pain and months of back pain.  (Doc. 7-11, p. 76).  Ms. Woods rated her pain level as ten.  (Doc. 7-11, p. 77).  Ms. Woods received aspirin, nitroglycerin, and morphine to treat her pain.  (Doc. 7-12, pp. 11, 20).[9]

Ms. Woods told Dr. Cooley, an emergency room physician, that she (Ms. Woods) had chest tightness that radiated into her neck.  (Doc. 7-12, p. 13).  Ms. Woods stated that exertion aggravated her chest pain.  (Doc. 7-12, p. 13).  Ms. Woods reported nightly symptoms of nausea and sweating.  (Doc. 7-12, p. 13).  Ms. Woods complained of "chronic shooting back pain."  (Doc. 7-12, p. 13).  Dr. Cooley

---

Ischemia is the "[i]nadequate blood supply to a local area due to blockage of blood vessels leading to that area." https://www.medicinenet.com/script/main/art.asp?articlekey=4052 (last visited Mar. 31, 2020).

[8] Lipitor or atorvastatin "is used . . . to help lower 'bad' cholesterol and fats . . . and raise 'good' cholesterol in the blood." https://www.webmd.com/drugs/2/drug-3330/lipitor-oral/details (Apr. 20, 2020).

[9] ASA is an abbreviation for aspirin. https://learnfirstaid.ca/nitro-aspirin-heart-attack/ (last visited Apr. 30, 2020).

ordered chest x-rays, and Dr. McGhee, a radiologist, reported no acute issue or change from the 2013 views.  (Doc. 7-12, p. 17; Doc. 7-13, p. 7).  Dr. Cooley described Ms. Woods's chest pain as atypical, identified hypertension and shortness of breath with exertion as risk factors, and transferred Ms. Woods to the hospital for observation under Dr. Honea's care.  (Doc. 7-12, pp. 20, 22).

The hospital referred Ms. Woods to Dr. Shah, a DCH cardiologist, for a consultation. (Doc. 7-11, p. 65).  Ms. Woods complained of left-side chest pain and shortness of breath.   (Doc. 7-11, p. 65).  Ms. Woods stated that her pain increased "with deep inspiration, some motion and position." (Doc. 7-11, p. 65).  Dr. Shah ran an EKG on Ms. Woods and found "[n]o distinct change" from her 2013 baseline report.  (Doc. 7-11, pp. 73-75).  Dr. Shah diagnosed Ms. Woods with chest pain and hypertension.  (Doc. 7-11, p. 67).  Dr. Shah planned to review Ms. Woods's cardiac enzymes and order a stress echocardiogram if the enzyme test results were negative. (Doc. 7-11, p. 67).  Ms. Woods experienced two episodes of chest pain in the evening of her admission, and the hospital treated the pain with morphine.  (Doc. 7-13, p. 8).

The next day, Ms. Woods had a stress echocardiogram; the results were negative for ischemia.  (Doc. 7-11, p. 71).  Ms. Woods did not complain of chest pain.  (Doc. 7-13, p. 8).  DCH discharged Ms. Woods and prescribed pantoprazole

sodium (two 40 mg tablets daily for two weeks; then one 40 mg tablet daily) and potassium chloride (20 milliequivalents daily).  (Doc. 7-13, p. 12).[10]

In January 2015, Ms. Woods returned to DCH and complained of chest and back pain.  (Doc. 7-14, p. 26).  Ms. Woods rated her pain level as a nine.  (Doc. 7-14, p. 14).  Ms. Woods told an emergency room resident that she had an acute episode of [morning] chest pain . . . followed by a [30-minute] nosebleed."  (Doc. 7-14, pp. 26, 32, 34; Doc. 7-15, p. 20).  Ms. Woods "describe[ed] the chest pain as 'something heavy and squeezing'" and reported accompanying nausea and abdominal pain.  (Doc. 7-14, p. 26).  Ms. Woods stated that her right lower back pain had persisted for six months and that the pain radiated into her legs.  (Doc. 7-14, p. 26).  Ms. Woods reported numbness, tingling, and an occasional "giv[ing] out" with her back pain.  (Doc. 7-14, p. 26).  According to Ms. Woods, the back pain was worse than the chest pain.  (Doc. 7-14, p. 26).

After examining Ms. Woods, the resident reported a positive right straight leg test.  (Doc. 7-14, p. 29).  The resident discussed Ms. Woods's case with Dr. Penkaya, an emergency department physician.  (Doc. 7-14, p. 32).  Dr. Penkaya noted that Ms.

---

[10] Pantoprazole "is used to treat certain stomach and esophagus problems (such as acid reflux)." https://www.webmd.com/drugs/2/drug-17633/pantoprazole-oral/details (last visited Apr. 30, 2020).

Potassium chloride "is a mineral supplement used to treat or prevent low amounts of potassium in the blood."  https://www.webmd.com/drugs/2/drug-676-7058/potassium-chloride-oral/potassium-extended-release-dispersible-tablet-oral/details (last visited Apr. 30, 2020).

Woods's EKG showed a T-wave inversion similar to previous EKGs.  (Doc. 7-14, p. 32).  Because of Ms. Woods's cardiac risk criteria and her uncomfortableness about returning home, Dr. Penkaya transferred Ms. Woods to the hospital for observation under the care of Dr. Krehbiel.  (Doc. 7-14, pp. 32, 33).

Ms. Woods stayed in the hospital for three nights, (Doc. 7-15, p. 25), and underwent diagnostic testing, (Doc. 7-15, pp. 12-19).  Ms. Woods had mostly normal results except for a hypertensive blood pressure response to stress and equivocal signs of ischemia.  (Doc. 7-15, pp. 14, 16, 20).

Later in January 2015, Ms. Woods visited Dr. Katona at Riverside Family Medicine and complained of constant, aching right-side back pain that radiated down into her hip and thigh.  (Doc. 7-15, pp. 32, 42).  Ms. Woods told Dr. Katona that the back pain began one year earlier and worsened with standing.  (Doc. 7-15, p. 42). Ms. Woods also complained of shoulder and arm pain.  (Doc. 7-15, p. 30).  Dr. Katona examined Ms. Woods and noted pain in Ms. Woods's right lower back. (Doc. 7-15, p. 31).   Dr. Katona gave Ms. Woods a back pain handout and recommended heat and ibuprofen or Tylenol for pain relief.  (Doc. 7-15, p. 32).  A few days later, Dr. Katona ordered x-rays of Ms. Woods's back.  Dr. McGhee, a radiologist, reported mild degenerative changes but made no acute findings.  (Doc. 7-15, p. 39).

In February 2015, Ms. Woods returned to Dr. Katona and complained of unstable hypertension and right shoulder pain. (Doc. 7-15, pp. 33, 35). Ms. Woods missed work on the day of the visit and reported a blood pressure reading of 259/129 from the previous day. (Doc. 7-15, p. 33). Ms. Woods's blood pressure was 184/110 in the office. (Doc. 7-15, p. 33). Ms. Woods stated that headaches, fatigue, and nausea accompanied her hypertension. (Doc. 7-15, p. 33). Dr. Katona gave Ms. Woods a hypertension handout and instructed her to return in one week for a blood pressure check. Ms. Woods described her shoulder pain as aching and chronic. (Doc. 7-15, p. 33). After examining Ms. Woods, Dr. Katona detected right shoulder pain with a decreased range of motion. (Doc. 7-15, p. 34). Dr. Katona planned to refer Ms. Woods to an orthopedic doctor. (Doc. 7-15, p. 34; Doc. 7-16, pp. 25-26).

Later in February 2015, Ms. Woods visited DCH's emergency department and complained of chest pressure that had begun one day earlier. (Doc. 7-11, pp. 46, 47 56). Ms. Woods rated her pain at eight. (Doc. 7-11, p. 47). Dr. Vetrano, the emergency department physician, ordered chest x-rays. (Doc. 7-11, pp. 60, 64). Dr. Bankston, a radiologist, found "[n]o significant abnormality" in Ms. Woods's lungs. (Doc. 7-11, pp. 60, 64). Dr. Vetrano found Ms. Woods's laboratory results unremarkable. (Doc. 7-11, p. 61). Dr. Vetrano discharged Ms. Woods with prescriptions to treat an upper respiratory infection. (Doc. 7-11, pp. 61–62).

In July 2015, Ms. Woods returned to DCH's emergency department and complained of right-side chest pain that radiated into her shoulder and arm. (Doc. 7-11, pp. 5, 26). Ms. Woods's blood pressure was 193/99, and her pain level was a nine. (Doc. 7-11, p. 14). Ms. Woods told Dr. Barton, the emergency department physician, that her pain began one day earlier and had increased in the morning while she was working, but had improved except for the right shoulder and right face "tightness". (Doc. 7-11, pp. 26, 33) (internal quotation marks omitted). Ms. Woods reported experiencing generalized weakness and nausea for one week. (Doc. 7-11, p. 26). Ms. Woods denied shortness of breath. (Doc. 7-11, p. 14).

DCH hospital admitted Ms. Woods under the care of Dr. Katona. (Doc. 7-11, pp. 32, 35–36). Ms. Woods saw Dr. Carraway, a cardiologist, for a consultative evaluation. (Doc. 7-11, pp. 5, 21). Ms. Woods told Dr. Carraway that the pain "felt like something is sitting on her chest." (Doc. 7-11, p. 5). Ms. Woods reported shortness of breath, nausea, and diaphoresis related to her chest pain. (Doc. 7-11, p. 5).[11] Dr. Carraway noted that Ms. Woods's EKG reports showed T-wave changes that appeared to be ischemic. (Doc. 7-11, p. 6; *see also* Doc. 7-11, pp. 10-12). Dr.

---

[11] "Diaphoresis is the medical term used to describe excessive, abnormal sweating in relation to [a person's] environment and activity level." https://www.healthline.com/health/diaphoresis (last visited Apr. 20, 2020).

Carraway diagnosed Ms. Woods with chest pain and possible angina, hypertensive urgency, and hyperlipidemia.  (Doc. 7-11, pp. 6-7).[12]

Dr. Carraway performed a heart catherization on Ms. Woods.  (Doc. 7-11, pp. 7, 37, 40-41).  The procedure revealed that Ms. Woods had "a severe 95% stenosis in the obtuse marginal branch off the circumflex artery."  (Doc. 7-11, p. 8).[13]  Dr. Carraway inserted a stent into the affected area.  (Doc. 7-11, p. 8).  After the surgery, Ms. Woods's blood pressure was excellent, and she was "pain free."  (Doc. 7-11, p. 8).  Dr. Carraway prescribed Ms. Woods Effient (one 10 mg tablet daily) and a low dose beta blocker (one metoprolol succinate 25 mg tablet daily).  (Doc. 7-11, pp. 37, 43).[14]  Dr. Carraway recommended that Ms. Woods continue statins (one 40 mg Lipitor tablet nightly) and dual antiplatelet therapy for one year.  (Doc. 7-11, pp. 37,

---

[12]  Angina is "[c]hest pain due to an inadequate supply of oxygen to the heart muscle." https://www.medicinenet.com/script/main/art.asp?articlekey=6594 (last visited Apr. 20, 2020).

[13]  "Stenosis is the narrowing or restriction of a blood vessel or valve that reduces blood flow." https://www.webmd.com/heart-disease/heart-failure/qa/what-is-the-definition-of-stenosis (last visited Apr. 30, 2020).

[14]  Effient or prasugrel "is used to prevent blood clots."  https://www.rxlist.com/effient-drug/patient-images-side-effects.htm (last visited Apr. 30, 2020).

Beta blockers "lower blood pressure, protect against heart attacks, and can improve the outlook for people with heart failure."  https://www.medicalnewstoday.com/articles/173068 (last visited Apr. 30, 2020).

43).[15]  Dr. Carraway authorized Ms. Woods's discharge the following morning. (Doc. 7-11, p. 37).

Later in July 2015, Ms. Woods visited Dr. Katona at Riverside Family Medicine for post-operative care.  (Doc. 7-15, pp. 37-38).  Dr. Katona instructed Ms. Woods to remain off work until she saw Dr. Carraway in August 2015.  (Doc. 7-15, p. 37).  Dr. Katona told Ms. Woods to avoid heavy lifting and to schedule a fasting-lab visit in four months.  (Doc. 7-15, p. 37).  Dr. Katona gave Ms. Woods handouts on cholesterol, coronary artery disease, exercise and weight control, fats in diet, and healthy eating, meal planning, and snacking.  (Doc. 7-15, p. 37).

In October 2015, Ms. Woods visited a certified registered nurse practitioner at Whatley Health Services, Inc. and complained of chest pain lasting four days.  (Doc. 7-16, pp. 7, 11).  Ms. Woods stated that her chest pain started gradually four days earlier before she ran out of medication.  (Doc. 7-16, p. 7).  Ms. Woods declined an emergency referral for the chest pain.  (Doc. 7-16, p. 10).  The CRNP instructed Ms. Woods to follow up with Dr. Carraway.  (Doc. 7-16, p. 10).

---

[15] "Statins are a class of drugs often prescribed by doctors to help lower cholesterol levels in the blood."     https://www.webmd.com/cholesterol-management/side-effects-of-statin-drugs   (last visited Apr. 30, 2020).

Dual antiplatelet therapy is the use of aspirin and another antiplatelet agent "that inhibit the platelets from clumping together and forming blood clots."  https://www.heart.org/-/media/data-import/downloadables/a/b/d/answers-by-heart---dapt-ucm_493120.pdf  (last visited Apr. 30, 2020).

A December 2015 progress note completed by a Whatley Health certified nursing aide reflects that Ms. Woods complained of left leg pain and swelling. (Doc. 7-16, p. 29). The CNA noted that Ms. Woods had stopped taking Lipitor in July due to the expense. (Doc. 7-20, p. 52). The CNA ordered diagnostic testing including an ultrasound of Ms. Woods's legs and a D-dimer test. (Doc. 7-20, p. 52). [16] Dr. Caldwell, a radiologist, compared the 2015 and 2013 ultrasound leg images and found "[n]o evidence of deep vein thrombosis in either lower extremity." (Doc. 7-11, p. 44; Doc. 7-16, p. 22). Ms. Woods's D-dimer test results were "In Range". (Doc. 7-16, p. 30; Doc. 7-20, p. 33).

Ms. Woods visited Dr. Carraway twice in January 2016 for cardiac treatment. During a mid-January 2016 visit, Ms. Woods's blood pressure "was significantly elevated," and she complained of chest pressure. (Doc. 7-16, p. 35). Dr. Carraway added Aldactone (one 50 mg tablet daily) to Ms. Woods's medication regimen. (Doc. 7-16, pp. 35, 38).

In late January 2016, Dr. Carraway noted that Ms. Woods's blood and chest pressure had improved and that her EKG reading reflected "no significant abnormalities." (Doc. 7-16, p. 35). Ms. Woods reported that she walked twice weekly for exercise. (Doc. 7-16, p. 36). After Dr. Carraway examined Ms. Woods,

---

[16] "A D-dimer test is a blood test that can be used to help rule out the presence of a serious blood clot." https://www.webmd.com/dvt/what-is-the-d-dimer-test#1 (last visited Apr. 30, 2020).

he reported that she "mov[ed] all extremities equally well." (Doc. 7-16, p. 37). Dr. Carraway instructed Ms. Woods to "continue activities as tolerated," reduce risk factors, and return in six months. (Doc. 7-16, p. 38).

In February 2016, Ms. Woods visited a Whatley Health CRNP and complained of mild, sporadic bilateral knee pain and stiffness. (Doc. 7-20, pp. 16, 18). Ms. Woods denied chest and back pain. (Doc. 7-20, p. 18). After examining Ms. Woods, the CRNP reported normal physical findings. (Doc. 7-20, pp. 18-19). The CRNP prescribed Mobic (one 7.5 mg tablet twice daily) and recommended that Ms. Woods apply Bengay, soak in Epsom salt, and elevate her knees for pain relief. (Doc. 7-20, p. 19).[17] The CRNP encouraged Ms. Woods to exercise. (Doc. 7-20, p. 19).

In March 2016, Ms. Woods complained of chest pain at DCH's emergency department and was admitted into the hospital. (Doc. 7-17, pp. 3, 14). Dr. Lehman ruled out an acute cardiac event and treated Ms. Woods for symptoms "consistent with bronchitis." (Doc. 7-17, pp. 4, 5, 10, 11). Dr. Lehman discharged Ms. Woods the following day. (Doc. 7-17, p. 5).

---

[17] Bengay is a topical medication "used to treat minor aches and pains of the muscles/joints." https://www.webmd.com/drugs/2/drug-61808/bengay-pain-relief-topical/details (last visited Apr. 30, 2020).

Epsom salt or magnesium sulfate "is a popular remedy for many ailments," including soreness and pain. https://www.healthline.com/nutrition/epsom-salt-benefits-uses (last visited Apr. 30, 2020).

In April 2016, Ms. Woods visited DCH's emergency department and complained of constant chest pain and pressure, weakness, imbalance, heavy sweating, and nausea. (Doc. 7-22, pp. 41, 42). The results of Ms. Woods's initial cardiac evaluation were negative. (Doc. 7-22, p. 47). Because of Ms. Woods's cardiac history, the emergency room doctor recommended Ms. Woods's admission to the hospital for further evaluation. (Doc. 7-22, pp. 47-48). Dr. Carraway performed a cardiac catheterization on Ms. Woods because of her unstable angina and an abnormal nuclear stress test result "consistent with possible ischemia." (Doc. 7-22, pp. 39; Doc. 7-19, p. 7; Doc. 7-20, pp. 4-5, 7; Doc. 7-22, pp. 37-40). Ms. Woods's catheterization results showed "a non-obstructive lesion on the 1st Diag: 50% stenosis; LCx: Large 10% diffuse disease distally; lesion on Prox RCA: Ostial 40% stenosis; and a lesion on the Mid RCA: Mid subsection 10% stenosis." (Doc. 7-19, p. 7; Doc. 7-20, p. 4).[18] After staying three nights, the hospital discharged Ms. Woods in an improved condition and instructed her to follow up with Dr. Carraway. (Doc. 7-22, pp. 29, 31).

In May 2016, Ms. Woods visited DCH's emergency department and complained of dizziness, general weakness, chest, tightness, nausea, and intermittent

---

[18] LCx is the left circumflex artery. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2933599/ (last visited Apr. 20, 2020).

RCA is the right coronary artery. https://www.ncbi.nlm.nih.gov/books/NBK2205/ (last visited Apr. 20, 2020).

right leg pain.  (Doc. 7-22, p. 20).  Ms. Woods described the chest pain as different

from when she had her stent surgery.  (Doc. 7-22, p. 20).  Ms. Woods's heart rate

reading was 49.  (Doc. 7-22, p. 20).  The emergency room doctor recommended Ms.

Woods's admission to the hospital.  (Doc. 7-22, pp. 26, 28).  Dr. Hwang, the hospital

physician, decided not to complete a cardiac workup on Ms. Woods and diagnosed

her with symptomatic bradycardia.  (Doc. 7-22, pp. 14, 15, 16, 19).[19]  Dr. Hwang

discharged Ms. Woods the following day in an improved condition after reducing

her Coreg dose.  (Doc. 7-22, pp. 14, 16, 19).[20]

In June 2016, Ms. Woods returned to Dr. Carraway for a catherization follow

up and complained of "a sharp, non-exertional, chest twinge" and "shortness of

breath with moderate exertion."  (Doc. 7-19, p. 37).  Dr. Carraway noted that Ms.

Woods's chest twinge was "atypical for cardiac pain."  (Doc. 7-19, p. 37).  Dr.

Carraway reported that Ms. Woods's breathing difficulty was consistent with her

catherization results, and he prescribed Lasix (one 20 mg tablet daily) to treat this

problem.  (Doc. 7-19, pp. 37, 40).[21]  Dr. Carraway noted that Ms. Woods's EKG

---

[19] Bradycardia "is a slower than normal heart rate."   https://www.mayoclinic.org/diseases-conditions/bradycardia/symptoms-causes/syc-20355474 (last visited Apr. 30, 2020).

[20] Coreg or carvedilol "is a beta-adrenergic blocking agent (beta-blocker) used to treat heart failure, hypertension, and left ventricular dysfunction after a heart attack."  Dizziness is a common side effect of Coreg.  https://www.rxlist.com/coreg-side-effects-drug-center.htm (last visited Apr. 30, 2020).

[21] Lasix is a diuretic "used to treat high blood pressure."  https://www.drugs.com/lasix.html (last visited Apr. 30, 2020).

"show[ed] no significant abnormalities" and that her blood pressure (140/88) had improved.  (Doc. 7-19, pp. 37, 39, 40).  Dr. Carraway instructed Ms. Woods to eat healthy, continue activities, and return in three months.  (Doc. 7-19, pp. 41, 44).

In August 2016, Ms. Woods visited a Whatley Health CRNP and complained of aching, sharp, and throbbing right knee pain.  (Doc. 7-20, pp. 21, 26).  According to Ms. Woods, moving and walking aggravated the pain; taking Mobic eased it. (Doc. 7-20, p. 21).  Ms. Woods reported experiencing joint "locking, numbness, popping and weakness" with the pain.  (Doc. 7-20, pp. 21, 23).  Ms. Woods denied chest and back pain.  (Doc. 7-20, p. 23).  After examining Ms. Woods, the CRNP detected right knee tenderness and left knee normalcy.  (Doc. 7-20, p. 24).  The CRNP ordered x-rays of Ms. Woods's right knee.  (Doc. 7-20, p. 24).  The CRNP instructed Ms. Woods to continue using Mobic and follow up as needed.  (Doc. 7-20, p. 24).

In November 2016, Ms. Woods visited DCH's emergency department and complained of intermittent chest pain that radiated to her right shoulder.  (Doc. 7-21, p. 43).  Ms. Woods reported that the pain increased with activity.  (Doc. 7-21, p. 43).  Ms. Woods complained of nausea and shortness of breath with exertion but denied vomiting and sweating.  (Doc. 7-21, p. 43; Doc. 7-22, pp. 5, 6, 7).  The emergency room doctor recommended Ms. Woods's admission to the hospital to rule out a heart attack.  (Doc. 7-21, p. 43; Doc. 7-22, pp. 11, 13).  Ms. Woods

recovered "well," and the hospital discharged her the following day after ruling out a cardiac event.  (Doc. 7-21, p. 43).

In January 2017, Ms. Woods visited DCH's emergency department and complained of middle chest pressure and radiating neck and back pain.  (Doc. 7-21, p. 31).  Ms. Woods also complained of upper epigastric, stomach, head, and right thigh pain.  (Doc. 7-21, p. 31).  Ms. Woods denied chest pain and shortness of breath. (Doc. 7-21, p. 31).  Based on Ms. Woods's 2016 negative stress test, symptoms, and diagnostic test results, Dr. Cooley, the emergency room physician, agreed with an advanced practice clinician's assessment, found that Ms. Woods's symptoms were "unlikely" cardiac-related, and diagnosed Ms. Woods with gastritis.  (Doc. 7-21, pp. 38, 41).[22]  Dr. Cooley instructed Ms. Woods to follow up with outpatient care.  (Doc. 7-21, p. 41).

Later in January 2017, Ms. Woods saw a Whatley Health CRNP and complained of burning bilateral leg pain.  (Doc. 7-20, pp. 34, 36, 39).  Ms. Woods denied chest, back and neck pain, and muscle weakness.  (Doc. 7-20, p. 36). After examining Ms. Woods, the CRNP reported normal physical findings.  (Doc. 7-20, p.

---

[22] An advanced practice clinician or APC "is an umbrella term that refers to both Physician Assistants (PA-C) and Advanced Practice Nurses (APN)—soon to be known as Advanced Practice Registered Nurses (APRN)." https://www.ahchealthenews.com/2018/10/18/health-care-provider-will-take-big-role-future-health-care/ (last visited Apr. 30, 2020).

37).  The CRNP ordered diagnostic testing for Ms. Woods's leg pain.  (Doc. 7-20, p. 38).

In February 2017, Ms. Woods saw a Whatley Health CRNP and complained of knee pain.  (Doc. 7-20, pp. 40, 45).  The CRNP noted that Ms. Woods had a positive ANA test in January and had received a rheumatologist referral but had not received appointment information.  (Doc. 7-20, pp. 40, 44).  The CRNP examined Ms. Woods, but the treatment notes do not include musculoskeletal findings.  (Doc. 7-20, pp. 43-44).

Later in February 2017, Ms. Woods visited Dr. Carraway and denied chest pain and shortness of breath.  (Doc. 7-19, p. 25).  Dr. Carraway noted that Ms. Woods was doing well and that her hypertension was under control.  (Doc 7-19, p. 25).  Dr. Carraway reported improvement with respect to Ms. Woods's coronary artery disease and discontinued her Plavix prescription.  (Doc. 7-19, p. 27).[23]  Dr. Carraway told Ms. Woods to continue aspirin and statin therapy.  (Doc 7-19, p. 27).  Dr. Carraway instructed Ms. Woods to resume Lasix (one 20 mg tablet daily) to treat her diastolic dysfunction.  (Doc. 7-19, p. 27).  Dr. Carraway did not adjust Ms. Woods's hypertension medication.  (Doc. 7-19, pp. 27-28).

---

[23] Plavix or clopidogrel is used "to keep blood vessels open and prevent blood clots after certain procedures (such as cardiac stent)."  https://www.webmd.com/drugs/2/drug-5869/plavix-oral/details (last visited Apr. 30, 2020).

In March 2017, Dr. Whitley of Whatley Health referred Ms. Woods to the Clinic for Rheumatic Diseases for a consultation because she had a positive antinuclear antibody test.  (Doc. 7-18, p. 17; Doc. 7-20, p. 28).[24]  At the clinic, Ms. Woods saw Dr. Maneice and complained of joint pain, "stiffness, swelling and functional limitation."  (Doc. 7-18, pp. 17, 25).  Ms. Woods identified her neck, knees, hips, and right shoulder as painful areas.  (Doc. 7-18, p. 17).  According to Ms. Woods, she experienced months of burning in her thighs and severe knee pain. (Doc. 7-18, p. 17).  Ms. Woods explained that she had had right shoulder surgery after she pulled a muscle mopping and lifting as a housekeeper.  (Doc. 7-18, p. 7). Ms. Woods stated that her neck pain began after the shoulder surgery and that she last worked two or three years earlier.  (Doc. 7-18, p. 7).

After examining Ms. Woods, Dr. Maneice detected mild scoliosis in Ms. Woods's thoracic and lumbar spine and noted tenderness due to spinous processes. (Doc. 7-18, p. 21). Dr. Maneice found no abnormalities in Ms. Woods's cervical spine, neck, gait, and musculoskeletal system.  (Doc. 7-18, p. 21).  Dr. Maneice provided the following joint findings:

> Total Tender Joints:  11.  RIGHT SHOULDER:  crepitus, pain on ROM, decreased [range of motion].  RIGHT HAND:  PIP I is positive for joint tenderness.  PIP III is positive for joint tenderness.  PIP IV is positive for joint tenderness.  DIP II is positive for joint tenderness. DIP III is positive for joint tenderness.  DIP IV is positive for joint

---

[24] An antinuclear antibody or ANA test "is used to help diagnose autoimmune disorders." https://medlineplus.gov/lab-tests/ana-antinuclear-antibody-test/ (last visited Apr. 30, 2020).

tenderness.   DIP V is positive for joint tenderness.   Degenerative changes of the DIPs with bony enlargement.  LEFT HAND:  PIP IV is positive for joint tenderness.   DIP II is positive for joint tenderness. DIP III is positive for joint tenderness.  RIGHT HIP:  trochanteric bursa tenderness.   RIGHT KNEE:  crepitus, mild effusion, joint tenderness, pain on [range of motion].  LEFT KNEE:  crepitus, pain on [range of motion].

(Doc. 7-18, pp. 21-22).[25]

Dr. Maneice ordered x-rays of Ms. Woods's knees and cervical spine and an ultrasound of the right knee.  (Doc. 7-18, pp. 18, 26-28).  The knee x-rays showed "[n]arrowing of the compartment[;] [m]arginal osteophytes of medial and later compartments[;] [l]ateral tracking of patellae bilaterally[;] patella alta left knee[;] narrowing of PF joints[; and] [m]arginal osteophyte of upper pole of patellae."  (Doc. 7-18, p. 18).   The right knee ultrasound revealed:

1.)   Moderate synovial effusion of the suprapatellar bursa, medial and lateral capsular recesses with hypertrophy of the synovium.   Power doppler imaging does not show hyperemia.

2.)   Normal appearance of the quadriceps and patellar tendons.

3.)   Hypertrophy of the prepatellar bursa.

4.)   Mild narrowing of the medial compartment of the knee with a normal appearance of the mid segment of the medial meniscus, but a sprain of the medial collateral ligament.

---

[25] PIP or the proximal interphalangeal joint is a middle finger joint.   https://www.arthritis-health.com/glossary/proximal-interphalangeal-pip-joints (last visited Apr. 30, 2020).

DIP or the distal interphalangeal joint "connects the bones at the tips of the fingers." https://www.medicalnewstoday.com/articles/326823 (last visited Apr. 30, 2020).

5.)   Normal appearance of the lateral meniscus, lateral collateral ligament, popliteal tendon, and iliotibial band.

(Doc. 7-18, p. 18).   The cervical spine x-ray showed degenerative disc disease in Ms. Woods's lower cervical spine "with facet spondyloarthrosis[;] [c]ervical ribs bilaterally."   (Doc. 7-18, p. 18).

Dr. Maneice's diagnoses included bilateral knee osteoarthritis, right knee effusion, cervicalgia, and cervical disc disorder.   (Doc. 7-18, pp. 23-24).   Ms. Woods received a right knee arthrocentesis for pain.   (Doc. 7-18, p. 22).[26]   Dr. Maneice instructed Ms. Woods to visit in two months.   (Doc. 7-18, p. 24).

In May 2017, Ms. Woods returned to Dr. Maneice and complained of neck, right hand, and right knee joint pain.   (Doc. 7-18, pp. 12, 14, 16).   Ms. Woods described the pain as moderate and constant and identified accompanying stiffness and chest pain.   (Doc. 7-18, p. 12).   Ms. Woods stated that the pain had worsened since the last visit and made exercising difficult.   (Doc. 7-18, p. 12).

After examining Ms. Woods, Dr. Maneice reported tenderness in Ms. Woods's cervical spine; normal musculoskeletal findings in the elbows and left shoulder, hand, and hip; joint tenderness in the right shoulder, hand, and knee; and bilateral knee crepitus.   (Doc. 7-18, p. 14).   Dr. Maneice detected degenerative

---

[26] Arthrocentesis is "[a] procedure in which a sterile needle and syringe are used to drain fluid from the joint. . . .   For certain conditions, medication is put into the joint after fluid removal." https://www.medicinenet.com/script/main/art.asp?articlekey=7090 (last visited Apr. 30, 2020).

changes with bony enlargement in Ms. Woods's distal interphalangeal joints. (Doc. 7-18, p. 14). Dr. Maneice diagnosed Ms. Woods with generalized osteoarthritis. (Doc. 7-18, p. 15). Dr. Maneice found that Ms. Woods's symptoms were negative for rheumatic disease and that there was "[n]o definite evidence" of an autoimmune disease. (Doc. 7-18, p. 15). Dr. Maneice instructed Ms. Woods to return for a reevaluation in three months. (Doc. 7-18, p. 15).

In July 2017, Ms. Woods visited DCH's emergency department and complained of chest and neck pain. (Doc. 7-21, pp. 22, 24). Ms. Woods described the chest pain as "tight" and similar to when Dr. Carraway performed her stent surgery. (Doc. 7-21, pp. 20, 22). Ms. Woods reported that her chest pain occurred overnight accompanied with nausea and lightheadedness. (Doc. 7-21, pp. 10, 22). During the triage assessment, Ms. Woods had shortness of breath and difficulty speaking. (Doc. 7-21, p. 22). Ms. Woods stated that moving worsened her pain and that nothing relieved it. (Doc. 7-21, p. 22). Ms. Woods denied radiating pain, palpitations, and cold sweats. (Doc. 7-21, pp. 10, 23). After examining Ms. Woods, the emergency room doctor detected her extremity pulses, a regular heart rhythm and rate without a murmur, and mild chest wall tenderness. (Doc. 7-21, pp. 24, 25, 30). Because Ms. Woods continued having chest pain, the emergency room doctor recommended that the hospital accept her transfer. (Doc. 7-21, p. 28). Ms. Woods felt "much better" two days later and was discharged after being informed of lifestyle

changes recommended to reduce the symptoms of acid reflux.  (Doc. 7-21, p. 10).

She was diagnosed with chest pain "most likely secondary to GERD."  (Doc. 7-21,

p. 11).  She was instructed to walk and engage in activity "as tolerated" and to stop

taking Ranitidine.  (Doc. 7-21, p. 12).

Later in July 2017, Ms. Woods visited a Whatley Health CRNP and

complained of shoulder and knee pain.  (Doc. 7-20, pp. 46, 48, 51).  Ms. Woods

stated that her shoulder pain had begun six months earlier.  (Doc. 7-20, p. 46).  Ms.

Woods denied chest pain.  (Doc. 7-20, p. 46).  The CRNP examined Ms. Woods and

reported normal musculoskeletal findings.  (Doc. 7-20, p. 48).  The CRNP diagnosed

Ms. Woods with generalized arthritis and renewed her Mobic prescription (one 7.5

mg tablet twice daily) which she had let run out.  (Doc. 7-20, pp. 49, 50).  The CRNP

instructed Ms. Woods to take methylprednisolon dose packs as directed.  (Doc. 7-

20, pp. 49, 50).[27]  As of this visit, Ms. Woods was taking more than 12 different

prescription medications daily.  (Doc. 7-20, p. 50).  The CRNP suggested that Ms.

Woods apply a topical analgesic or 20 minutes of warmth on affected joints.  (Doc.

7-20, p. 49).  The CRNP recommended that Ms. Woods exercise three times weekly

and follow up with her rheumatologist.  (Doc. 7-20, p. 49).

---

[27] Methylprednisolone is a steroid used to treat inflammatory conditions like arthritis.
https://www.drugs.com/mtm/medrol-dosepak.html (last visited May 8, 2020).

In August 2017, Ms. Woods saw a Clinic for Rheumatic Diseases CRNP and complained of joint pain, especially in the left shoulder. (Doc. 7-18, pp. 3, 9). Ms. Woods stated that she could "hardly raise the shoulder." (Doc. 7-18, p. 3). Ms. Woods rated her pain at 8.5. (Doc. 7-18, p. 8). Ms. Woods reported that she had started methadone treatment. (Doc. 7-18, p. 3). The CRNP ordered x-rays and an ultrasound of Ms. Woods's left shoulder. (Doc. 7-18, p. 7). The results of these tests revealed a sprain of the AC joint ligament, a downslope of the acromion, tendinosis, partial thickness tear of the supraspinatus tendon, and thickening of the subacromial subdeltoid bursa. (Doc. 7-18, pp. 7, 10-11). Ms. Woods received an arthrocentesis major joint injection in her shoulder. (Doc. 7-18, pp. 6-7). The CRNP instructed Ms. Woods to return in four months. (Doc. 7-18, p. 8). Dr. Jones reviewed and approved the visit details. (Doc. 7-18, pp. 8-9).

In mid-August 2017, Ms. Woods visited DCH's emergency department and complained of difficulty swallowing. (Doc. 7-32, pp. 3, 4). Ms. Woods denied chest pain and shortness of breath. (Doc. 7-21, p. 4). After examining Ms. Woods, the emergency department doctor reported normal extremity, back, and chest wall findings. (Doc. 7-21, pp. 5, 6, 9).

In late August 2017, Ms. Woods visited Dr. Carraway and denied chest pain and shortness of breath. (Doc. 7-19, pp. 7, 10). Dr. Carraway noted that Ms. Woods's blood pressure reading of 140/100 was not "ideal." (Doc. 7-19, pp. 7, 9).

29

After examining Ms. Woods, Dr. Carraway noted that she moved her extremities well.   (Doc. 7-19, p. 9).   Based on Ms. Woods's echocardiogram results, Dr. Carraway added diagnoses of pulmonary, tricuspid, and mitral insufficiency.  (Doc. 7-19, pp. 10, 16; Doc. 7-20, pp. 10-11).   Ms. Woods's diastolic dysfunction, coronary artery disease, and hypertension -- diagnosed in August 2015 -- remained problematic.  (Doc. 7-19, pp. 16-17).   Dr. Carraway's instructions to Ms. Woods included weighing and exercising daily, eating healthy, quitting smoking, monitoring and controlling blood pressure, continuing medications, scheduling an EKG, and returning in one year.  (Doc. 7-19, pp. 11-12, 15).

In October 2017, Ms. Woods visited DCH's emergency department and complained of constant left-side chest pain that radiated to her back and left arm. (Doc. 7-23, p. 10).  Ms. Woods rated the pain at six.  (Doc. 7-23, p. 10).  Ms. Woods also complained of shoulder pain and shortness of breath.  (Doc. 7-23, p. 10).  The emergency department physician ordered x-rays of Ms. Woods chest, and the radiologist reported "[n]o significant acute . . . abnormality."  (Doc. 7-23, pp. 14-15).   The emergency room doctor recommended Ms. Woods's admission to the hospital.  (Doc. 7-23, p. 23).

After her admission, Ms. Woods rated her pain at eight.  (Doc. 7-23, p. 16). Ms. Woods reported that the pain intensified with exertion, and rest eased it.  (Doc. 7-23, p. 16).  Dr. Bui, a hospital doctor, classified Ms. Woods's status as a "moderate

risk." (Doc. 7-23, p. 16).[28]  Ms. Woods stayed in the hospital two nights.  (Doc. 7-23, p. 3).  During the discharge process, Ms. Woods stated that she was feeling better and pain-free.  (Doc. 7-23, p. 3; *see also* Doc. 7-23, p. 5 (describing Ms. Woods's condition as "[g]ood, [s]atisfactory, [s]table, [i]mproved)).   In the discharge documentation, Dr. Mohan, a hospital physician, noted a reduction in Ms. Woods's carvedilol dosage from twice to once daily.  (Doc. 7-23, pp. 6-7, 8).

B.     The ALJ's RFC Determination

Initially, S. Jackson, a single decisionmaker or SDM, determined that Ms. Woods was not disabled.  (Doc. 7-4, pp. 14, 28).  Following this review of the administrative record, the ALJ found that Ms. Woods could perform unrestricted light work.  (Doc. 7-3, p. 14).  The ALJ noted that the agency opinions supporting the Commissioner's initial determination were from a non-medical source and that there were "no medical opinions in the record."  (Doc. 7-3, p. 19; *see* Doc. 7-4, pp. 9-14, 24-28).  The ALJ discounted Ms. Woods's subjective testimony as "not fully consistent with the medical evidence" and unpersuasive in showing "an inability to perform" light work.  (Doc. 7-3, p. 19).

---

[28] Dr. Bui is a doctor of osteopathic medicine or D.O.  D.O.s are licensed doctors who "graduated from a U.S. osteopathic medical school." https://www.mayoclinic.org/healthy-lifestyle/consumer-health/expert-answers/osteopathic-medicine/faq-20058168 (last visited Apr. 30, 2020).

C.     Analysis

Ms. Woods contends that the ALJ did not develop the record adequately with respect to her RFC.  (Doc. 9, p. 3).  Ms. Woods maintains that the ALJ should have ordered a consultative examination or considered medical expert testimony at the hearing to make an informed RFC determination.  (Doc. 9, p. 5).  Remand is appropriate because the ALJ's RFC determination is not supported by substantial evidence.

Ms. Woods observes correctly that an ALJ does not have to support an RFC with a medical opinion.  (Doc. 9, p. 6); *see Castle v. Colvin*, 557 Fed. App. 849, 853 (11th Cir. 2014) ("Because we conclude that the record was fully and fairly developed, a consultative examination was not necessary for the ALJ to make an informed decision.").[29]  Still, the ALJ must do more than summarize the medical evidence—the ALJ must explain how the medical evidence supports the RFC that the ALJ selects.  *See, e.g., Hunter v. Colvin*, No. CA 2:12-00077-C, 2013 WL 1219746, at *2 (S.D. Ala. Mar. 25, 2013) ("Because the ALJ has failed to link his RFC determination to specific evidence in the record regarding the plaintiff's ability

---

[29] In *Castle*, the Eleventh Circuit Court of Appeals explained that Mr. Castle's medical records concerning a degenerative knee condition were less complicated than the claimant's record of "a serious heart condition and multiple stays at the hospital" in *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996). *Castle*, 557 Fed. Appx. at 854. Consequently, unlike *Manso-Pizarro*, Mr. Castle's case did not require a consultative examiner's interpretation of the available medical data.  *Castle*, 557 Fed. Appx. at 854.

to work despite the limitations caused by her impairments, the Court cannot adequately assess whether the RFC is supported by substantial evidence.").

Here, the ALJ determined that Ms. Woods suffered from the severe impairments of hypertension, diastolic dysfunction, cervical and lumbar spine degenerative disc disease, knee degenerative joint disease, obesity, chronic obstructive pulmonary disease (COPD), and left shoulder degenerative arthritis. (Doc. 7-3, p. 14). The ALJ based this finding on Ms. Woods's medical history, which includes, among other things, diagnostic testing, hospitalizations, cardiac catherization and stent procedures, and steroid injections. But the ALJ did not explain why that medical evidence demonstrates that Ms. Woods could, at the time of the ALJ's decision, perform unrestricted light work. *See Stephens v. Astrue*, No. CA 08-0163-C, 2008 WL 5233582, at *3 (S.D. Ala. Dec. 15, 2008) ("[A]n ALJ's RFC determination must be supported by substantial and tangible evidence, not mere speculation regarding what the evidence of record as a whole equates to in terms of physical abilities."). On remand, in explaining his RFC assessment, the Commissioner should please decide whether a consultative examination of Ms. Woods is appropriate.

The Court makes two other observations regarding the ALJ's decision. First, the ALJ weighed in his assessment of Ms. Woods's subjective reports of her

symptoms her non-compliance with her prescription medication.  (Doc. 7-3, p. 18).

The ALJ wrote:

> It appears the claimant has had an issue with medication compliance as
> she reported being out of her blood pressure medication for three days
> in October 2015. While the claimant's noncompliance is not a basis for
> denying her claim, it is a basis for finding that her subjective reports are
> not consistent with the objective medical evidence. As such non-
> compliance would not be expected were the claimant's impairments as
> severe or disabling as alleged, and suggests that the claimant's
> symptomatology is tolerable without the need to follow these
> recommendations.  Furthermore, SSR 82–59 states, "An individual
> who would otherwise be found to be under a disability but who fails
> without justifiable cause to follow treatment prescribed by a treating
> source which the Social Security administration (SSA) determines can
> be expected to restore the individual's ability to work cannot b[y] virtue
> of such failure to be found under a disability."

(Doc. 7-3, p. 18) (record citation omitted).

As noted above, although Ms. Woods reported in October 2015 that she had

run out of medication for chest pain (Doc. 7-16, p. 7), she reported two months later

in December 2015 that she had stopped taking Lipitor in July due to the expense.

(Doc. 7-20, p. 52).  Again, in July 2017, Ms. Woods reported that she had let her

Mobic prescription run out, (Doc. 7-20, pp. 49, 50), but Mobic was one of more than

12 different prescription medications that Ms. Woods was supposed to take daily, in

addition to other prescription medications that Ms. Woods took less frequently,

(Doc. 7-20, p. 50).  The evidence indicates that Ms. Woods was having to choose

which prescription medications to take because she had so many, and she could not

afford all of them.  Thus, her failure to follow her prescription regimen appears to be justifiable.  *See Dawkins v. Bowen*, 848 F.2d 1211, 1214 (11th Cir. 1988) ("[P]overty excuses noncompliance . . . We therefore must reverse the judgment of the district court and remand with instructions that the case be remanded to the Secretary for determination by the ALJ as to whether appellant is disabled, without reference to her failure to follow prescribed medical treatment."); *compare Ellison v. Barnhart*, 355 F.3d 1272 (11th Cir. 2003).  On remand, the ALJ shall please consider the impact of Ms. Woods's ability to afford her considerable total dosage of prescription medication.

Second, at the administrative hearing, in response to a question from the ALJ concerning absenteeism, the vocational expert testified:  "Most employers allow no more than one absence per month and many of those in the first 90 days do not allow any.  There would [be] some employers who allow up to two."  (Doc. 7-3, p. 74). The medical record demonstrates that between January 2015 and October 2017, on several occasions, Ms. Woods was hospitalized for two to three days at a time for evaluations of chest pain.  On remand, the ALJ shall please address the VE's testimony and the records of Ms. Woods's hospitalizations.

## V.   CONCLUSION

For the reasons discussed above, the Court remands the Commissioner's decision.  The Court will enter a separate final order closing the case.

**DONE** and **ORDERED** this May 22, 2020.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE